# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00333-COA

**MICHAEL GREENE A/K/A MICHAEL JAVONNE GREENE A/K/A MICHAEL GREEN**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/2024 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS MICHAEL GREENE (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 04/14/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., EMFINGER AND WEDDLE, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1. A Hinds County Circuit Court jury convicted Michael Greene[1] of one count of capital murder for the death of Steven Woods and one count of possession of a firearm by a felon. The Hinds County Circuit Court sentenced Greene to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) for capital murder and to a concurrent term

---

[1] Although the record reflects alternate spellings for Greene's last name, we use the spelling that Greene provided during his trial testimony on direct examination.

of ten years for possession of a firearm by a felon. On appeal from his convictions and sentences, Greene (through a pro se supplemental brief) and his appellate attorney raise numerous issues. Upon review, we find dispositive the argument that the circuit court erred by failing to give the jury a cautionary instruction on accomplice testimony. Based on this error, we reverse Greene's convictions and sentences and remand the matter for a new trial. In so doing, we decline to address Greene's remaining arguments on appeal.

**FACTS**

¶2. On November 18, 2021, Officer Edward Smith with the Jackson Police Department responded to a reported shooting in the parking lot of a Rally's. Upon arriving at Rally's, Officer Smith found Demesha Matlock applying pressure to the neck of her boyfriend, Steven Woods. Woods, who was in the driver's seat of his Honda Accord, had sustained a single gunshot wound and was later pronounced dead at the scene.

¶3. Matlock eventually admitted to the officers that she and Woods had stopped at Rally's so Woods could sell someone marijuana. Upon arriving at Rally's, Woods parked next to a Dodge Charger. Woods instructed Matlock to move to the Accord's back seat, and she complied. Woods then made a phone call and informed the person who answered that he (Woods) had arrived at Rally's. An unknown man exited the Charger and climbed into the front passenger seat of Woods's Accord.

¶4. Matlock stated that the stranger pulled out a black Glock and demanded money from her and Woods. According to Matlock, Woods was trying to reach for his own handgun when she heard a gunshot. Matlock testified that the unknown man grabbed a bag of

2

marijuana by Woods's feet and exited the Accord. Matlock saw the assailant get into the backseat of the waiting Charger. She testified that the man struggled to get inside the Charger because items appeared to be falling out the open door onto the parking lot. Matlock climbed back into the front passenger seat of the Accord, retrieved her own handgun from her purse, and fired several shots at Woods's shooter. She then began applying pressure to the bullet wound in Woods's neck and called 911.

¶5. Matlock later testified at trial that she met with Detective Terrence Jackson of the Jackson Police Department about three times after Woods's shooting. In each interview, Matlock consistently described Woods's shooter as skinny, tall, and dark skinned. At trial, Matlock testified that the shooter also wore a black jacket and had either a hat or mask rolled up above his eyebrows to his hairline. In addition, Matlock stated that the shooter had tattoos by his eyes. Although she could not recall during which of her meetings with Detective Jackson she had first mentioned the shooter's facial tattoos, Matlock insisted during her trial testimony that she had informed Detective Jackson about the shooter's tattoos.

¶6. At no point during her trial testimony did Matlock identify Greene, the defendant, as Woods's shooter. Matlock testified that in April 2022, during her third visit with law enforcement, Detective Jackson showed her a lineup with six photographs. Greene's photograph was not included in the lineup. Instead, Matlock circled the photograph of a man named Jarrick Sumrell, who had tattoos to the sides of his eyes on his cheekbones. Matlock told Detective Jackson that she thought Sumrell could have been Woods's shooter.

¶7. At trial, Matlock admitted that prior to the April 2022 photograph lineup, Woods's

mother had sent her photographs of various people, including Sumrell, to see if Matlock might recognize one of the men as Woods's shooter. Matlock clarified, however, that she never felt pressured to identify Sumrell as Woods's shooter. In response to questions asked at trial, Matlock agreed that all the windows of Woods's Accord, including the front windshield, were tinted and that it was almost dark outside when she and Woods arrived at Rally's. Matlock further agreed that Woods's shooter was cast in a shadow when he climbed into the Accord.

¶8. Following the report of Woods's shooting, officers searched the area and discovered a bag of marijuana, a pair of white shorts, and a single tennis shoe in the Rally's parking lot near Woods's vehicle. Further investigation revealed a .9mm Luger shell casing and projectile fragment on the backseat floorboard of Woods's Accord, as well as a .380-caliber Taurus handgun on the front passenger side floorboard between the seat and the door. Matlock later confirmed to officers that she owned the Taurus handgun, which she admitted to firing at Woods's shooter as the man fled toward the Charger.

¶9. Officers also reviewed Rally's video surveillance footage recorded at the time of the shooting. The surveillance footage showed the Charger, which officers later learned was owned by Gregory Beales, pull into the Rally's parking lot. A few minutes later, Woods's Accord parked beside the Charger. A man wearing a black jacket and jeans exited the Charger and got into the Accord. The Charger then backed out of its parking spot and stopped. The man in the black jacket and jeans exited Woods's Accord and climbed into the backseat of the Charger. The Charger then drove away from the scene.

4

¶10.    During their investigation, officers received information that pointed to Beales; his cousin, Sumrell; Greene; and Pierre Alexander as potential suspects involved in Woods's shooting. Detective Jackson testified that he questioned Sumrell, who stated that he was not present when Woods was shot. Sumrell claimed, however, to have knowledge of the shooting from Beales. Sumrell stated that Beales had been inside the Charger with Alexander and Greene when Woods was shot. Sumrell claimed Beales had said that Alexander and Greene had shot Woods. Detective Jackson showed Sumrell a lineup containing Greene's photograph. Sumrell circled Greene's photograph and wrote, "This is the guy my cousin [(Beales)] said shot Steve [Woods]." Despite Sumrell's claims that he had no involvement in Woods's shooting, Detective Jackson testified that Sumrell remained a suspect in the investigation.

¶11.    Based on Sumrell's information, Detective Jackson located and questioned Beales. Although Beales did not testify at trial, Detective Jackson informed the jury what he had learned from Beales during the course of his investigation. Beales admitted that he owned the Charger involved in Woods's shooting, but he denied being inside the vehicle at the time of the shooting. Detective Jackson testified that Beales instead stated that he (Beales) had loaned the Charger to Alexander and Greene. Beales told Detective Jackson that he had been told that Greene shot Woods. Detective Jackson showed Beales a lineup containing Sumrell's photograph. The photograph lineup was admitted into evidence at trial. On the lineup, Beales circled Sumrell's photograph and wrote, "He has nothing to do with it. He was not there."

5

¶12. Detective Jackson testified that he then interviewed Alexander. Alexander informed Detective Jackson that he was hanging out with Beales, Sumrell, and Greene on the day of Woods's shooting. Alexander stated that the men ran out of marijuana, and Beales called Woods to schedule a time to buy more marijuana. According to Alexander, when they arrived to meet Woods, Greene exited Beales's Charger and walked over to Woods's Accord. Alexander told Detective Jackson that he heard a "pop," but Alexander never claimed that he actually saw Greene shoot Woods. In addition, Alexander never told Detective Jackson that he saw a gun in Greene's possession. Alexander stated that Greene ran back to Beales's Charger "with a large amount of marijuana," and Beales drove to another location. According to Alexander, the four men then divided the marijuana they had obtained from Woods.

¶13. Detective Jackson showed Alexander two different photograph lineups. The first lineup contained Greene's photograph, and the second lineup contained Sumrell's photograph. Alexander circled Greene's photograph and wrote, "[H]e's the robber." In the second lineup, Alexander circled Sumrell's photograph and wrote, "[H]e was present inside [the] veh[ic]le."

¶14. Although he reviewed the Rally's surveillance footage multiple times, Detective Jackson testified that from the footage, he was unable to identify the man who exited Beales's Charger and got into Woods's Accord. Even though Detective Jackson stated that Beales, Sumrell, and Alexander had indicated that Greene shot Woods, he acknowledged that Matlock had identified Sumrell as the shooter when he showed her the photograph lineup.

6

Based on the results of the investigation, Beales, Sumrell, Alexander, and Greene were all charged with capital murder in connection with Woods's shooting. Detective Jackson testified that Greene was also later charged with being a felon in possession of a firearm.

¶15. Alexander testified that on the day of the shooting, he was visiting his mother. Alexander saw Beales at another house nearby, and Alexander asked if Beales had any marijuana that he (Alexander) could buy. Beales stated that he did not have any marijuana but that he was about to go purchase some marijuana from a third party. Alexander testified that he decided to ride with Beales in his Charger to also buy some marijuana. When Alexander got into Beales's Charger, he noted that the vehicle was filled with piles of clothing, shoes, and other items.

¶16. Alexander testified that Greene and another guy were also in the Charger with him and Beales. Alexander stated that Beales identified the fourth man as his cousin, Sumrell. Alexander claimed at trial, however, that he had just learned Beales had lied to him about the fourth man's identity and that the man was actually named "Matthew." According to Alexander, he had seen Sumrell in the hallway just before testifying. Alexander stated that Sumrell said Beales had lied and that "it wasn't him [(Sumrell)]" in the Charger on the day of Woods's shooting.

¶17. Alexander stated that on the day of the shooting, Beales drove everyone to Rally's in Jackson. After arriving at Rally's, Beales made a phone call and let the seller know they had arrived. Alexander testified that Greene, who was wearing a black jacket, got out of Beales's Charger and walked over to another vehicle. Alexander stated that Greene was holding some

7

money that Beales had given him to purchase the marijuana. Alexander once again confirmed that he never saw a gun in Greene's possession. Moreover, in contrast to Detective Jackson's earlier testimony, Alexander stated during cross-examination that he never heard a gunshot.

¶18. Alexander testified that while Greene was inside the seller's vehicle, Beales backed out of his parking spot and then waited for Greene to return. Once Greene returned, Beales drove away. After receiving his portion of the marijuana, Alexander left the other men. He testified that he did not know anyone had been shot. According to Alexander, he only learned about the shooting when other people later mentioned that they had heard about the incident on the news.

¶19. During Alexander's testimony, the defense entered into evidence the two photograph lineups in which he had identified Greene as "the robber" and Sumrell as another person inside Beales's Charger at the time of the shooting. Alexander acknowledged at trial that like Greene, he had been charged with capital murder for Woods's death. At the time of Greene's trial, Alexander's capital-murder charge was still pending, and he was awaiting his own trial on the charge.

¶20. During Greene's trial, the State informed the circuit court that Sumrell intended to testify about newly disclosed information. Specifically, Sumrell planned to testify that Greene had recently made a jailhouse confession to him regarding Woods's shooting. Over the defense's objection, the circuit court allowed Sumrell to testify about the newly disclosed information.

¶21.    On direct examination, Sumrell acknowledged that he had also been charged with capital murder in relation to Woods's death, and he stated that he had not been offered anything in exchange for his trial testimony. Sumrell testified that after being arrested in connection with the shooting, he spoke with Detective Jackson and denied any involvement. Sumrell stated he told Detective Jackson that he had heard about the shooting from his cousin, Beales. Sumrell further stated that Beales, along with Alexander and Greene, had been the ones involved in Woods's shooting. Sumrell testified that he later learned Matthew Taylor had also been present when Woods was shot.

¶22.    Sumrell also testified that after his arrest, he and Greene "were housed together [i]n [the same] lockdown unit . . . ." Sumrell stated that during that time, Greene admitted to robbing Woods for money and marijuana. According to Sumrell, Greene said that Beales and Alexander were looking for someone to rob Woods. Greene stated that he agreed to commit the robbery. Sumrell testified that Greene confessed he had not meant to shoot Woods in the neck and kill him. Sumrell stated that Greene instead intended to shoot Woods in the arm because he thought Woods was trying to reach for a gun. Sumrell also stated that he and Greene had discussed Greene's upcoming trial. Sumrell testified that Greene admitted to asking his wife to lie for him and to say that they were together at the time of Woods's shooting. Sumrell stated that Greene and his wife had fake text messages and photographs with fake time stamps that they planned to use to create an alibi for Greene.

¶23.    Following Sumrell's direct examination, the circuit court recessed. When the trial resumed the next day, Greene's attorney informed the circuit judge about an email the State

had sent him the previous afternoon regarding an agreement the State had reached with Sumrell. The copy of the agreement provided to Greene's attorney was unsigned, and the document had not yet become public record. As a result, the defense asked the circuit judge to take judicial notice of the agreement as an official document from the District Attorney's Office and to allow Greene's attorney to enter the agreement into evidence. The agreement provided that the State now had reason to believe Sumrell was not involved in Woods's murder. As a result, in exchange for Sumrell's truthful testimony at Greene's trial consistent with his prior statements, the State agreed to dismiss all charges against Sumrell, regardless of the outcome of Greene's trial.

¶24.   After hearing argument on the matter, the circuit judge denied the defense's request to take judicial notice of the agreement. The circuit judge instead stated the issue was one for the defense to address on cross-examination. On cross-examination, Greene's attorney asked Sumrell about his tattoos, which were on either side of his eyes along his cheekbones. Greene's attorney also asked Sumrell about the photograph lineup that Detective Jackson had shown Sumrell following his arrest. The lineup contained Greene's photograph. Sumrell testified that he had circled Greene's photograph and written, "This is the guy my cousin [(Beales)] said shot Steve [Woods]."

¶25.   Sumrell denied having entered into any agreement with the State regarding his capital-murder charge and his testimony at Greene's trial. When Greene's attorney handed Sumrell the agreement, Sumrell acknowledged that he had previously seen the document. Sumrell stated, however, that he did not understand what the document meant, and he denied that

anyone had spoken with him about the dismissal of the charges against him. Because the agreement was unsigned by Sumrell, the defense was allowed to have the document marked for identification purposes, but the document was not entered into evidence.

¶26. Greene testified on his own behalf. Greene stated that he had never previously spent time with Alexander, Beales, and Sumrell. In addition, Greene stated that he had never spoken with any of the three men about his case and the charges against him, and he denied ever making a jailhouse confession to Sumrell. Greene also denied being incarcerated with Sumrell. On direct examination, Greene admitted that he had previously been convicted of a felony. He testified that he was released from prison in 2020, and he stated he therefore was not allowed to possess a firearm. As a result, Greene denied being in possession of a firearm on the day of Woods's shooting.

¶27. According to Greene, he was with his wife, Jonecia Greene,[2] and their children on the day of Woods's shooting. Greene stated that although his wife's birthday had been on November 17, 2021, they had not celebrated then because they had taken their children to the doctor. As a result, he testified that he and his family spent the day celebrating together on November 18, 2021. Greene stated that he and his wife took their children to a park at the Ross Barnett Reservoir. Greene testified that they went to the park around noon and did not return home until that evening.

¶28. On cross-examination, the State entered into evidence four photographs taken by Greene's wife, Jonecia. Greene testified that one photograph showed him at the doctor's

---

[2] Although the record reflects alternate spellings for Jonecia's first name, we use the spelling that she provided during her trial testimony on direct examination.

office with his family, another photograph showed him and his wife at home, and the remaining two photographs showed him at the park with his family. In several of the photographs, Greene wore a combination of a black hat and a black jacket. Although Greene acknowledged that the black hat and jacket he wore in the photographs resembled the clothing worn by Woods's shooter, he maintained that he had nothing to do with the shooting.

¶29. Like Greene, Jonecia testified that their family had gone to the doctor's office on her actual birthday and then celebrated her birthday the following day. Jonecia stated that the family had arrived at the park at the Ross Barnett Reservoir just before noon and had remained at the park until around 7 p.m. Jonecia acknowledged that she had taken the four photographs of Greene admitted into evidence.

¶30. After the defense rested its case-in-chief, the State called Hinds County Sheriff Tyree Jones as a rebuttal witness. Contrary to Greene's testimony that he had never been imprisoned with Sumrell, Sheriff Jones stated that prison records reflected that Greene and Sumrell had been housed in the same unit in January 2024. Sheriff Jones testified that Greene and Sumrell would have had plenty of opportunity to interact with one another during their unit's recreational hour. Following Sheriff Jones's testimony, the State finally rested as well.

¶31. After being instructed by the circuit court, the jury deliberated and found Greene guilty of both Woods's capital murder and being a felon in possession of a firearm. For capital murder, the circuit court sentenced Greene to life imprisonment in MDOC's custody.

For being a felon in possession of a firearm, the circuit court sentenced Greene to serve a concurrent term of ten years in MDOC's custody. Greene unsuccessfully moved for a new trial. Aggrieved, Greene appeals.

**DISCUSSION**

¶32. Although Greene raises numerous issues in his appellate and pro se supplemental briefs, we find dispositive his argument that the circuit court erred by refusing a cautionary jury instruction on accomplice testimony. At trial, the defense proposed jury instruction D-7, which stated the following:

> The Court instructs the jury that the law looks with great suspicion and distrust on the testimony of an alleged accomplice and requires the jury to weigh [the] same with great care, caution[,] and suspicion. You should weigh the testimony from alleged accomplices, and passing on what weight, if any, you should give the testimony, you should weigh it with great care and caution and look upon it with distrust and suspicion.

¶33. The State objected to the proposed jury instruction on the basis that no one else admitted to being an accomplice to the crime. The circuit judge initially granted the request for the proposed jury instruction but then decided to refuse the instruction. After considering the State's argument on the matter, the circuit judge concluded that she could only give the proposed jury instruction if a witness had actually admitted he was an accomplice. As the circuit judge noted, however, Alexander, Beales, and Sumrell each denied any involvement with Woods's robbery and shooting. Based on each man's denial that he had participated in the crime, the circuit judge found there was no evidentiary basis upon which to give a cautionary instruction regarding accomplice testimony.

¶34. On appeal, Greene argues that the only evidence tying him to Woods's robbery and

13

the shooting was the accomplice testimonies of Alexander and Sumrell. Greene further argues that Alexander's and Sumrell's testimonies were not corroborated by other trial evidence. Moreover, Greene asserts that the circuit judge erred by concluding that Alexander and Sumrell failed to constitute accomplices simply because they did not admit to being accomplices.

¶35. "[D]efendants are entitled to have instructions on their theory of the case presented to the jury for which there is foundation in the evidence, even though the evidence might be weak, insufficient, inconsistent[,] or of doubtful credibility[.]" *Jones v. State*, 283 So. 3d 64, 72 (¶41) (Miss. 2019). We review a circuit court's decision to give or refuse jury instructions for abuse of discretion. *Fears v. State*, 402 So. 3d 791, 797 (¶32) (Miss. Ct. App. 2025).

¶36. Relevant to Greene's argument on appeal, the Mississippi Supreme Court has previously held that

> the uncorroborated testimony of an accomplice may be sufficient to convict an accused[.] This rule is inapplicable in those cases where the testimony is unreasonable, self-contradictory[,] or substantially impeached. Only slight corroboration of an accomplice's testimony is required to sustain a conviction. The testimony that must be corroborated is the part connecting the defendant to the crime. If the testimony is not corroborated, a cautionary jury instruction is required.

*Jones v. State*, 203 So. 3d 600, 606 (¶11) (Miss. 2016) (citations and internal quotation marks omitted); *see also Williams v. State*, 32 So. 3d 486, 491 (¶19) (Miss. 2010) ("In determining whether a cautionary jury instruction is required, the testimony that must be corroborated is the testimony tying the defendant on trial to the crime, and it is irrelevant whether other portions of the accomplice's testimony are corroborated."). Moreover, our supreme court has

explained "that testifying accomplices cannot corroborate each other sufficiently to obviate the necessity of a cautionary jury instruction." *Williams*, 32 So. 3d at 492 (¶21). Thus, "a cautionary jury instruction is required even though multiple accomplices testify and may corroborate each other." *Id.*

¶37. "An accomplice is a person who is implicated in the commission of the crime, and if the evidence gives a reasonable inference that the person may have been a co-perpetrator or the sole perpetrator, then that person is an accomplice." *Fears*, 402 So. 3d at 797 (¶36) (internal quotation mark omitted). Upon review, we conclude the record contains sufficient evidence to support finding that Alexander and Sumrell constituted accomplices to Woods's robbery and shooting and that their testimonies connecting Greene to the crimes were uncorroborated. Along with Greene and Beales, both Alexander and Sumrell were indicted for capital murder in Woods's death. At the start of Greene's trial, the charges against Alexander and Sumrell remained pending. Thus, as Greene asserts in his appellate brief, admitting at his trial that they were actual accomplices to the crime would have been detrimental to their own unresolved cases.

¶38. In addition, despite Alexander's denials that he robbed or shot Woods, he placed himself and Sumrell at the scene of the crime. Alexander told Detective Jackson that he, Sumrell, and Greene rode with Beales to meet Woods and purchase marijuana. By his own admissions before and during trial, Alexander provided "a reasonable inference" that he and Sumrell were involved in the commission of the crime. *Id.* Prior to trial, Alexander identified Sumrell from a photograph lineup and, as discussed, told Detective Jackson that

15

Sumrell was one of the other men inside Beales's Charger at the time of the shooting. Moreover, Matlock, who was the only eyewitness to the shooting, also picked out Sumrell from a photograph lineup and identified him as Woods's shooter.

¶39.    We also conclude from our review of the record that other trial evidence failed to corroborate the alleged accomplice testimony connecting Greene to Woods's murder.  The record is devoid of any witness who admitted to being present at the time of Woods's shooting and who also affirmatively identified Greene as Woods's shooter.  Even Alexander, who stated that Greene got into Woods's Accord, testified at trial that he never saw a gun in Greene's possession or heard anything to indicate that a shooting had occurred.  And Matlock, the only other individual actually inside Woods's Accord, identified Sumrell—not Greene—as the shooter.  Even during her trial testimony, Matlock never identified Greene as Woods's shooter.

¶40.    The State also presented no ballistics or DNA evidence that linked Greene to the crime.  Even the video footage recovered from Rally's surveillance cameras, which showed an individual entering and exiting Woods's Accord, was insufficient to provide Detective Jackson with a positive identification of the individual.

¶41.    Due to the presence of evidence that implicated Alexander and Sumrell as accomplices to Woods's murder, as well as a lack of corroborating evidence to support their testimonies that Greene committed the crime, we conclude that Greene was entitled to a cautionary jury instruction on accomplice testimony.  Because we find that the circuit court erred by failing to give such an instruction as Greene requested, we reverse Greene's

16

convictions and sentences and remand the matter to the circuit court for a new trial.

## CONCLUSION

¶42.    Based on the reasoning set forth above, we reverse Greene's convictions and sentences and remand the matter to the circuit court for a new trial.

¶43.    **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR.**